BERAR ENTERPRISES, INC v HARMON

Docket No. 78-4162. Submitted January 3, 1980, at Lansing.—Decided November 4, 1980.

Stewart Earle and Elsie Earle were owners of 13,552 acres of land comprising a resort called Blaney Park. The land was leased with an option to buy to Gerald L. Harmon and Herbert F. Schott, a partnership doing business as Intermar of Michigan (Intermar). Intermar owned an additional 3,000 acres of Blaney Park which it intended to develop along with the leased property. Intermar contracted with Berar Enterprises, Inc., a real estate brokerage firm, to sell its 3,000 acres as lots for cash or on land contracts. Intermar further agreed to convey the 13,552 acres it was then leasing from the Earles to a corporation to be formed by the buyers of the lots for common usage when all the lots were sold or when Intermar had received $3 million in payments for the sale of the lots on the cash sales and land contract sales. Upon the sale of all the lots, Intermar was unable to exercise its option to purchase the 13,552 acres, and the Earles refused to enter into an alternate agreement for its purchase.

On the final day of its lease with the Earles, Intermar brought an action against the Earles in Schoolcraft Circuit Court to declare and establish purchase terms under its lease and option agreement with the Earles and for specific performance of the agreement. The Earles counterclaimed to remove

REFERENCES FOR POINTS IN HEADNOTES

[1] 46 Am Jur 2d, Judgments §§ 409, 410.

[2] 47 Am Jur 2d, Judgments §§ 1091, 1092.

Modern views of state courts as to whether consent judgment is entitled to resjudicata or collateral estoppel effect. 91 ALR3d 1170.

[3] 46 Am Jur 2d, Judgments §§ 473, 709.

[4] 46 Am Jur 2d, Judgments § 770.

[5] 47 Am Jur 2d, Judgments § 945.

[6] 46 Am Jur 2d, Judgments §§ 473, 825.

[7] 46 Am Jur 2d, Judgments §§ 834, 837.

[8] 27 Am Jur 2d, Equity § 136 et seq.

[9] 1 Am Jur 2d, Accord and Satisfaction §§ 12, 13.

a cloud on their title to the property. Blaney Park, Inc., a corporation formed by the owners of Blaney Park property purchased from Intermar through Berar, was allowed to intervene on behalf of itself and as a representative of and trustee for the owners. Blaney Park, Inc. filed a third-party complaint, naming Intermar and Berar as third-party defendants, seeking subrogation to the rights of Intermar against the Earles, damages against Intermar for breach of contract, and for fraud and misrepresentation on the part of Intermar and Berar that Intermar owned the 13,552 acres. Intermar counterclaimed against Blaney Park, Inc. for tortious interference with its contractual relationships by notifying individual purchasers of lots of the action then pending in Schoolcraft Circuit Court and that future payments on their land contract obligations with Intermar were to be paid into an escrow account, rather than to Intermar.

A consent judgment between all the parties except Berar was entered in Schoolcraft Circuit Court which provided that: 1) title to the 13,552 acres was quieted in the Earles, 2) the Earles were to transfer the acreage to Blaney Park, Inc. on land contract, 3) Intermar's interest in the 3,000 acres it originally owned was to be cancelled, and ownership of the land and any interest of Intermar's was to be transferred to Blaney Park, Inc., 4) all land around Blaney Park which was owned by Intermar, its partners, or their wives was to be transferred to Blaney Park, Inc., 5) Blaney Park, Inc. was to assume certain debts of Intermar pertaining to the property, but not its debt to Berar, and 6) all claims except Berar's were dismissed with prejudice. Blaney Park, Inc.'s fraud action against Berar was subsequently dismissed for no progress.

Prior to the entry of the consent judgment, Berar brought an action against Intermar in Livingston Circuit Court, for the balance due it on the commissions for the sale of Intermar's 3,000 acres, and judgment was entered in favor of Berar for $576,124.76. The judgment was never satisfied, and Berar subsequently filed a complaint for supplementary proceedings due to Intermar's failure to satisfy the judgment, joining Blaney Park, Inc. in its corporate capacity and as representative and trustee for the owners of the lots as a third-party defendant. A jury found, as a matter of fact, that the conveyance by Intermar of its interest in the Blaney Park property to Blaney Park, Inc. was fraudulent as to Berar, and the court, Paul R. Mahinske, J., ordered Blaney Park, Inc. to pay the full amount of Berar's judgment against Intermar and to refrain from disposing of any interest in or proceeds it received from the property.

Blaney Park, Inc. appeals, alleging that the Schoolcraft Circuit Court consent judgment is res judicata, barring the litigation in Livingston Circuit Court and that the Livingston Circuit Court had no jurisdiction to entertain a collateral attack on the Schoolcraft judgment. *Held:*

1. The Schoolcraft Circuit Court action involved issues different from those in the Livingston Circuit Court action. Although both actions involved transactions among the same parties, the facts and evidence essential to the maintenance of them were not identical, and the doctrine of res judicata is inapplicable.

2. Berar failed to move to set aside the Schoolcraft judgment as prescribed by court rule within the time limitation required. It also failed to allege that the judge who entered the consent judgment was absent or unable to act when it initiated its collateral attack against the Schoolcraft Circuit Court judgment in Livingston Circuit Court. Nor did it convincingly show perpetration of fraud. It failed to state on the record in the Schoolcraft action how it would be prejudiced by the entry of the consent judgment and failed to inform the trial judge of the pending Livingston action which could have afforded him the opportunity to reject the settlement and order the parties to proceed to trial. Even had the settlement been approved following such notification, Berar could have brought a direct appeal from the Schoolcraft decision. It is, thus, not entitled to equitable relief, not having acted in an equitable manner. Furthermore, the property transfer from Intermar to Blaney Park, Inc. did not constitute a fraudulent conveyance. Intermar received adequate consideration therefor in being released of its obligation to convey the 13,552 acres. Thus, the Livingston Circuit judge was without jurisdiction to entertain an action to set aside the consent judgment as a fraudulent conveyance.

Reversed.

1. ACTIONS — RES JUDICATA.

The doctrine of res judicata is inapplicable where the facts and evidence essential to the maintenance of two actions are not identical, although both actions originate from transactions among the same parties.

2. ACTIONS — CONSENT JUDGMENTS — COLLATERAL ESTOPPEL.

Consent judgments cannot be given collateral estoppel effect in a later action because the parties have not litigated the matters put in issue; they have merely settled, and the issues involved have not been adjudicated.

3. COURTS — RELIEF FROM FINAL JUDGMENTS — MOTIONS — COURT RULES.

A court, on motion, may relieve a party or his legal representative from a final judgment, order, or proceeding for fraud, misrepresentation, or other misconduct of an adverse party (GCR 1963, 528.3[3]).

4. COURTS — VACATION OF JUDGMENTS OR ORDERS — COURT RULES.

No judgment or order should be set aside or vacated and no proceeding under a judgment or order should be stayed by any circuit judge except the one who made the judgment or order unless he is absent or unable to act, in which case such actions may be undertaken by any judge of the circuit or any judge assigned thereto (GCR 1963, 529.2).

5. ACTIONS — DIRECT ATTACKS ON JUDGMENTS — COLLATERAL ATTACKS ON JUDGMENTS — LIMITATION OF ACTIONS — COURT RULES.

A party should directly attack a judgment or final order before the judge who made the judgment or order within the time limitation prescribed, but a party is not precluded from initiating an independent equitable action for fraud upon the court beyond such time limitation (GCR 1963, 528.3, 529.2).

6. JUDGMENTS — EQUITABLE INTERFERENCE WITH JUDGMENTS — FRAUD.

Fraud warranting equitable interference with a judgment or final order by a court should be positive, such as a material misrepresentation, not merely constructive fraud in obtaining the judgment.

7. ACTIONS — COLLATERAL ATTACK ON JUDGMENTS — FRAUD — RELIANCE.

A party asserting fraud in a collateral attack on a judgment must show reliance upon a fraudulent representation; but a party cannot reasonably rely on a representation he knows to have been false when made.

8. EQUITY — CLEAN HANDS.

To be entitled to equitable relief, a party must come before a court with clean hands.

9. PROPERTY — REAL PROPERTY — CONSIDERATION — STATUTES.

Satisfaction of an existing obligation or antecedent debt may constitute fair consideration for property or obligation (MCL 566.13; MSA 26.883).

*Dennis C. Drury,* for plaintiff.

*Dobson & Griffin, P.C.* (by *R. Drummond Black),* for defendant Blaney Park, Inc.

Before: ALLEN, P.J., and V. J. BRENNAN and MacKENZIE, JJ.

MacKENZIE, J. Blaney Park, Inc. appeals as of right from a judgment entered in Livingston County Circuit Court on September 25, 1978, in supplementary proceedings brought pursuant to MCL 600.6101 *et seq.;* MSA 27A.6101 *et seq.,* ordering Blaney Park, Inc. to pay to Berar Enterprises, Inc. the full amount of a judgment rendered against Intermar at the principal trial in the amount of $576,124.76 plus statutory interest at the rate of six per cent per annum from June 23, 1971.

The issue herein is whether plaintiff Berar, a third-party defendant in an earlier action in Schoolcraft County resolved by the entry of a consent judgment without plaintiff's consent but with plaintiff's knowledge, may thereafter bring the instant action in another circuit to have the portions of the consent judgment which provide for conveyance of real estate set aside as a fraudulent conveyance.

In April of 1968, Stewart and Elsie Earle were the fee owners of the bulk of property called Blaney Park, a vacation resort located in Schoolcraft County in the Upper Peninsula. On April 5, 1968, the Earles leased 13,552 acres of the property to Intermar of Michgian, a land development partnership comprised of defendants Harmon and Schott. The Earles also gave Intermar an option to purchase the property on specific terms during the term of the lease until January, 1971. Intermar

intended to develop the property, along with 3,000 acres of Blaney Park it already owned, into a vacation resort.

In November, 1968, Intermar entered into a contract with Berar, a real estate brokerage firm, giving Berar the exclusive right to sell lots in Blaney Park for a 50 per cent commission totalling $1.5 million. Intermar and Berar agreed that the 3,000 acres owned by the developer would be divided into 300 lots of 10 acres each and sold to individual purchasers for $10,000 cash or on land contract. When the entire 300 parcels were sold, Intermar would convey, in addition, the remaining 13,552 acres of Blaney Park to a corporation formed by the titleholders of the parcels to be used in common. Under the agreement, in the event of a cash sale, Berar was to receive its commission outright; otherwise, Berar would retain the cash downpayments and collect the balance of its commission by transmittal from Intermar of not less than 35 per cent of the payments received from the land contract vendees until Berar was paid in full.

By August, 1969, all 300 parcels in Blaney Park had been sold. The deeds or land contracts to purchasers provided that Intermar would convey the remaining 13,552 acres to the property owner's association when all of the parcels had been sold for cash, or on land contracts paid in full, or when Intermar had received payments totalling $3 million, whichever came first. By January, 1971, Blaney Park, Inc., the property owner's association, had been formed and had taken over management of the resort.

Meanwhile, Intermar began experiencing financial difficulties in paying Berar its commission, partly because certain land contract vendees had

fallen behind in their payments. Intermar and Berar negotiated a supplemental agreement, but soon Intermar could not meet its obligations under the new agreement. After several months of erratic payments, Berar received no further commission payments from Intermar. Berar had received $907,278 of its expected commission, leaving a delinquency of $592,722.

By July, 1971, Intermar had received $1,276,834.50 in cash payments from purchasers on the land contracts, leaving a balance due of $1,723,165.50. Intermar was unable to exercise its option to purchase the 13,552 acres from the Earles because of its financial difficulties and cash flow problems. The Earles refused to accept several alternate payment plans proposed by Intermar, insisting on a cash purchase in accord with the terms of the original agreement.

On December 31, 1970, Intermar brought an action against the Earles in Schoolcraft County Circuit Court, asking the court to declare the purchase terms and grant specific performance of the lease-option agreement. The Earles counterclaimed for removal of the cloud on their title to the 13,552 acres and for $921,826 which Intermar owed on the lease.

Blaney Park, Inc., intervening in the Schoolcraft action, demanded assurances from Intermar that it would receive title to the additional acreage. The property owner's association also filed a third-party claim against Intermar, Berar Enterprises, and Berar's principals, seeking to be subrogated to the rights of Intermar against the Earles and requesting damages for breach of contract and fraud against Intermar and Berar for misrepresenting to the purchasers that Intermar owned all of the resort at the time the lots were sold.

Simultaneously with the filing of the third-party complaint, the land contract vendees began paying their installments, totalling $30,000 per month, into an escrow account at the First National Bank of Manistique. Intermar, thereafter, received no further payments on the land contracts with the exception of two or three deposited in the Brighton State Bank. As a result, Intermar cross-claimed against Blaney Park, Inc. in the Schoolcraft suit for tortious interference with a contractual relationship.

On June 22, 1971, Berar sued Intermar in Livingston County Circuit Court for the balance due on its commission for selling Blaney Park lots, approximating $627,000. There is no indication in the record that Berar or Intermar ever informed Circuit Judge William F. Hood, presiding in the Schoolcraft action, or the other parties to that action, of the Livingston County suit. At this time, Intermar discovered that it could not float a mortgage on its land contract receivables, since the land contracts carried only a seven per cent interest rate, making them an unattractive investment for mortgage brokers during a period when the interest rate soared to ten per cent.

On September 15, 1972, two weeks before the case was scheduled for trial, a consent judgment was entered in the Schoolcraft action signed by all parties except Berar. Berar's counsel informed the court that his objection to the entry of the consent judgment was premised on Blaney Park's refusal to include Berar in the settlement and to dismiss its damage claim against Berar.[1]

---

[1] Berar's counsel stated as follows at the hearing conducted prior to entry of the consent judgment:

"MR. McFARLAND: Yes, your Honor. I feel very strongly about this matter. We have been involved in the preliminary discussions with all of the parties relative to settlement, and I certainly think that settlement is in the best interests of everybody.

"I want to say at this time that my client, Lee Berar, is adamant in his determination that the corporation get what they bargained for, get the property, and my reluctance today to approve the consent judgment is in no way—I would not want it to be interpreted in any way as a disapproval by Mr. Berar of the basic terms and provisions of the settlement.

"However, I do feel that if the settlement is fair and it is appropriate that it be entered today without notice to Mr. Berar, without notice that it is to be entered, I would feel that the Court should at least permit me to make a motion to have Mr. Berar as a third party defendant also included in the settlement and have his—have the intervening plaintiff's action against him also dismissed with prejudice.

"And I think that the statements made by Mr. Barense to the Court just now would clearly indicate that there would be no basis for continuing the litigation as to Mr. Berar under these circumstances if in fact it is to be dismissed with prejudice against Intermar, and if the Court would entertain such a motion and if the parties—perhaps the parties might well give some consideration to that at this time, and if that were the case that the litigation could be dismissed with prejudice as to Mr. Berar also, I would approve the entry of the order today—the consent judgment today. * * *

"MR. McFARLAND: Well, I fail to find in the pleadings any privity between Blaney Park and Berar. The corporation was not in existence at the time Mr. Berar undertook to sell the Blaney Park project, and it seems to me that Mr. Barense's position is somewhat inconsistent.

"He said he feels the corporation has the right to act on behalf of the participants, and he admits that the only relief that he asked for was on behalf of the corporation to have the damages established or else to have the property conveyed. He has accomplished that purpose on behalf of the corporation, and I think really indirectly on behalf of the participants, and it seems to me that the basic allegations of misrepresentation, which is the basis for his complaint, those allegations are certainly directed at Intermar as the principal, and to Mr. Berar as the agent of Intermar, and it seems grossly unjust that the corporation would be able to come in now and to split their threats and their allegations and try to force the parties to settle separately, and I—as the court well knows, I am very much opposed to a settlement in which Mr. Berar's interests in the whole matter are not taken into consideration and he is given an adequate opportunity to protect his interests in the Blaney Park project; just as I said, to protect his reputation and his business integrity by defending this lawsuit, in this particular lawsuit, and under those circumstances I would vigorously oppose the entry of this consent judgment today.

"I don't feel there has been appropriate notice, and I don't believe that the case—this matter can be disposed of without appropriate notice and a hearing at least by all the parties litigant. I would agree that with the proper notice and hearing in the matter, and proper pleadings being filed, that the Court undoubtedly has the right to enter a consent judgment as between some of the parties litigant, but I don't believe it can be done or should be done without adequate

The consent judgment provided that title to the 13,552 acres in Blaney Park be quieted in the Earles, who were to transfer the acreage to Blaney Park, Inc. upon satisfactory performance by the latter of a new land contract with the Earles. The consent judgment also cancelled Intermar's interest in the 3,000 acres it owned in Blaney Park and transferred ownership of the land and any interest of Intermar in the land contracts thereon to Blaney Park, Inc. All land around Blaney Park owned by Intermar, its individual partners, or their wives was transferred to Blaney Park, Inc. Under the consent judgment, Blaney Park, Inc. was to assume certain debts of Intermar, including obligations for improvements to the resort and debts of $33,735.20 to certain specified creditors, not including Berar.

All claims among all parties to the Schoolcraft suit, except Berar, were dismissed with prejudice. Blaney Park, Inc.'s fraud action against Berar in Schoolcraft County was later dismissed for no progress on January 14, 1977.

At the time the property transfer was made from Intermar to Blaney Park, Inc. under the consent judgment, Intermar owed Blaney Park, Inc. $116,319.28 of the $300,000 pledged for maintenance. According to Intermar's books, it was solvent prior to the property transfer, which rendered it insolvent.

Blaney Park, Inc. entered into a land contract with the Earles to purchase the 13,552 acres for $1.3 million, but defaulted, and a judgment of foreclosure was entered on June 7, 1978.

On March 26, 1975, Berar obtained a judgment

notice or proper pleadings unless I am in a position to consent to that today, and I am not.

"I object under the conditions that I have laid down just now."

of $576,124.76 against Intermar in the Livingston County suit following a bench trial.[2] This judgment, representing the difference between commissions paid and commissions owed, was never satisfied.[3] On March 1, 1977, Berar filed a complaint in Livingston County for supplementary proceedings under MCL 600.6101 *et seq.;* MSA 27A.6101 *et seq.,* in which Blaney Park, Inc. was joined as a third-party defendant. Following a jury trial and verdict that Blaney Park, Inc. was liable to Berar for the full amount of the judgment, Blaney Park, Inc. brings this appeal as of right.

Initially, Blaney Park, Inc. argues that the Schoolcraft consent judgment is res judicata, barring the litigation herein. We disagree. The two actions clearly involved different issues. The Schoolcraft action was concerned with the problems of who had title to the 13,552 acres and the alleged fraud perpetrated by Intermar and Berar in misrepresenting that Intermar owned that property. The Livingston action concerned the payment of Berar's commission and enforcement of that judgment. Although both originated from Blaney Park and its problems, since the facts and evidence essential to the maintenance of the two actions were not identical, the doctrine of res judicata is inapplicable. *American Mutual Liabil-*

[2] Affirmed in an unpublished memorandum opinion, *Berar Enterprises, Inc v Gerald R Harmon,* (Docket No. 25322, released July 23, 1976).

[3] On December 15, 1975, pursuant to Berar's motion for entry of judgment against three banks, judgment was entered ordering the Brighton State Bank to release to Berar the land contracts and funds it held of $279.52. The file does not indicate that McPherson State Bank ever disclosed whether it had any of Intermar's land contracts or that Berar moved for judgment based on a writ of garnishment against it. The First National Bank in Howell was adjudged liable to Berar for the full amount of the judgment of $576,124.76 for releasing land contracts to Blaney Park, Inc. However, that judgment was reversed in *Berar Enterprises, Inc v Harmon,* 93 Mich App 1; 285 NW2d 774 (1979).

*ity Ins Co v Michgian Mutual Liability Co,* 64 Mich App 315, 324-325; 235 NW2d 769; 91 ALR3d 1159 (1975). Moreover, because Berar refused to sign the consent judgment, it is not clear that the settlement should be res judicata as to Berar. See *American Mutual, supra,* 324, fn 3.

Secondly, for the reasons stated in *American Mutual, supra,* 327-329, we are not persuaded that any issues are litigated in a consent judgment such that they should be accorded collateral estoppel effect in a later action. This is particularly true where the party against whom the consent judgment is sought to be enforced did not agree to its entry.

The next issue is whether Circuit Judge Paul R. Mahinske, presiding in the Livingston action, had jurisdiction to entertain a collateral attack on the consent judgment entered in an order dated September 15, 1972, by Judge Hood in Schoolcraft County. Pursuant to the jury's determination in the Livingston action that the property transfer under the earlier consent judgment constituted a fraudulent conveyance under MCL 566.221; MSA 26.971, Judge Mahinske entered an order on September 25, 1978, enjoining Blaney Park, Inc. from transferring the vendor's interest in the land contracts it received under the consent judgment, as well as any other non-exempt property. The order also entered judgment against Blaney Park, Inc. in the amount of $576,124.76.

In essence, Judge Mahinske's order permitted a collateral attack on the consent judgment for fraud. In Michigan, the procedure for attacking a final judgment or order for fraud is delineated in GCR 1963, 528.3, to wit:

"On motion and upon such terms as are just, the

court may relieve a party or his legal representative from a final judgment, order or proceeding for the following reasons: * * * (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; * * * The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than 1 year after the judgment order or proceeding was entered or taken. A motion under sub-rule 528.3 does not affect the finality of a judgment or suspend its operation. This rule does not limit the power of the court to entertain an independent action to relieve a party from a judgment, order, or proceeding, or to grant relief to a defendant not actually personally notified as provided in sub-rule 528.2 above, or to set aside a judgment for fraud upon the Court."

Additionally, GCR 1963, 529.2 mandates that a party directly attack a judgment or final order before the judge who made the judgment or order.

"No judgment or order shall be set aside or vacated, and no proceeding under a judgment or order shall be stayed by any circuit judge except the one who made the judgment or order, unless he is absent or unable to act. If the circuit judge who made the judgment or order is absent or unable to act, an order vacating or setting aside the judgment or order or staying proceedings under the judgment or order may be made by any of the other judges of the circuit or any judge assigned to the circuit."

The policy behind GCR 529.2 is that "[i]f a judgment or order is to be set aside, vacated or stayed, it should normally be done only by the judge who made the judgment or order, since he is best qualified to pass upon the matter, and since it would obviously detract from the dignity and stability of judicial action if a dissatisfied litigant could run about seeking to have it upset by other trial judges". 3 Honigman & Hawkins, Michigan

Court Rules Annotated (2d ed), p 230. In *Wilson v Romeos,* 387 Mich 664, 678; 199 NW2d 208 (1972), the Michigan Supreme Court held that a second judge had no jurisdiction to set aside an order of settlement entered by a previous judge and to try the case.

In the case at bar, Berar clearly failed to make a motion to set aside the consent judgment within the time limitations of the court rule. Nor was there any allegation that Judge Hood was absent or unable to act.

GCR 528 does not preclude an independent equitable action for fraud upon the court beyond the one-year time limit; however, relief is only appropriate in limited circumstances. Prior to the enactment of GCR 528 and 529, a party was permitted to wage a collateral attack on a judgment for extrinsic fraud in the procurement of the judgment. See *Fawcett v Atherton,* 298 Mich 362; 299 NW 108 (1941).[4] In *Kita v Matuszak,* 55 Mich App 288, 294; 222 NW2d 216 (1974), this Court held that "[t]he fraud warranting equitable interference must be positive, not merely constructive fraud in obtaining the judgment". In *Banner v Banner,* 45 Mich App 148, 154; 206 NW2d 234 (1973), the question of what is meant by a "fraud upon the court" was considered.

A fraud is perpetrated upon a court when some material fact is concealed from that court or when some material misrepresentation is made to that court. *De-Haan v DeHaan,* 348 Mich 199 (1957); *Baum v Baum* [20 Mich App 68, 72 (1969)]. In the instant case plaintiff testified on December 2, 1969, as to a possible reconciliation of the parties. The decision not to take additional proofs on the issue of reconciliation was made by the

---

[4] Seemingly, GCR 529 limits the action to a direct attack on the judgment.

trial court, not by either party. Thus, no fraud was perpetrated upon the court."

Plaintiff herein does not offer a convincing explanation of how entry of the Schoolcraft consent judgment perpetrated a fraud on plaintiff. Although the consent judgment was entered without plaintiff's consent, plaintiff was given the opportunity at that time to state on the record how entry of the consent judgment would have prejudiced plaintiff. Had plaintiff informed Judge Hood of its claim against Intermar for its commission, then pending in Livingston County, in all likelihood, Judge Hood would have rejected the settlement and ordered the parties to go to trial. Even if Judge Hood had approved the settlement, since plaintiff was a party to the action and affected by the order, plaintiff could have brought a direct appeal.

Generally, a party asserting fraud must show reliance upon a fraudulent representation by the defendant. *Michael v Jones,* 333 Mich 476; 53 NW2d 342 (1952), *Phillips v Smeekens,* 50 Mich App 693, 697; 213 NW2d 862 (1973), *lv den* 391 Mich 818 (1974). One cannot reasonably rely on a representation he knows is false at the time made. *Phillips, supra.*

Any claim that plaintiff was unaware at that time that the settlement would render Intermar insolvent is unpersuasive. Plaintiff was present when provisions of the settlement, which terminated any property interest of Intermar in Blaney Park, were explained on the record. Moreover, it is evident from the pleadings and the close business relationship between plaintiff and Intermar that plaintiff knew that all of Intermar's assets were tied to Blaney Park. This leads us to the inevitable

conclusion that plaintiff chose not to object too strenuously to entry of the settlement because entry of the settlement was to plaintiff's advantage, possibly precluding Blaney Park, Inc.'s action for fraud against plaintiff as well.

We do not believe plaintiff should, in all fairness, be permitted to sit idly by while a consent judgment affecting its rights is entered and later attack it as effectuating a fraudulent conveyance. In order to be entitled to equitable relief, plaintiff must come in with clean hands. *Stachnik v Winkel,* 394 Mich 375; 230 NW2d 529 (1975).

Further, we do not believe the property transfer herein constituted a fraudulent conveyance as envisioned by MCL 566.14; MSA 26.884. Intermar did receive adequate consideration for the transfer in being released from its obligation to convey the 13,552 acres of property to Blaney Park. Satisfaction of an existing obligation or antecedent debt constitutes fair consideration. MCL 566.13; MSA 26.883.

In the present case, there is no indication that Intermar gave away more than it received. Although the developer lost whatever interest it had in the Blaney Park project, it had already defaulted on the purchase option for the 13,552 acres of land owned by the Earles. Under the consent judgment, Blaney Park, Inc. was faced with the heavy financial burden of "redeeming" that property pursuant to a land contract for $1.3 million.

Therefore, we hold that Judge Mahinske was without jurisdiction to entertain an action to set aside the consent judgment as a fraudulent conveyance.

Reversed. Case dismissed with costs to defendant Blaney Park, Inc.